BERNAL, (UNITED STATES v.) See Cases Nos. 14,578–14,583.

## Case No. 1,346.

BERNARD et al. v. ASHLEY et al.

ASHLEY et al. v. BERNARD et al.

[Hempst. 665.][1]

Circuit Court, D. Arkansas. April Term, 1853.[2]

PUBLIC LANDS — PRE-EMPTION CLAIMS—VACATING PATENTS—ACTS OF GOVERNMENT AGENTS.

1. It is competent for the government to sanction the widest departure from its regulations relative to the public lands, or waive any irregularity in the acts of its agents, and which will be binding as against itself, but cannot affect rights which have vested in others.
[See note at end of case.]

2. Pre-emption claims rejected, patents ordered to be vacated, and title quieted.
[See note at end of case.]

[In equity. Bill by Elizabeth J. Bernard, Mary A. Bernard, Corine Bernard, and Thomas Bernard, (heirs of Thomas Bernard, deceased,) by William Cannon, their next friend, against Mary W. W. Ashley, (executrix of Chester Ashley, deceased,) William E. Ashley, and Henry C. Ashley, (heirs of Chester Ashley, deceased,) and Silas Craig, to vacate patents to land. Cross-bill by defendants against original complainants. Decree for defendants to original bill. Original complainants subsequently appealed to the supreme court. Affirmed in Barnard v. Ashley, 18 How. (59 U. S.) 43.]

Albert Pike, for complainants.

J. M. Curran and F. W. Trapnall, for defendants.

RINGO, District Judge, having been of counsel, and being also interested in the suit, did not sit.

DANIEL, Circuit Justice. The original bill is brought to vacate patents to four quarter sections of land granted to defendant Craig, and in which Ashley and Craig were jointly interested, and one patent granted to William Nooner, who conveyed the land in that patent to Ashley. The allegations on which the prayer of the original bill is founded, are, that Bernard and the several persons under whom he derives title had, under the act of congress of June 19th, 1834, [4 Stat. 678, c. 54,] a valid right of pre-emption to the several parcels of land above mentioned, which right had been established to the satisfaction of the government, and patents issued in conformity therewith; that under an act of congress, approved on the 2d of March, 1831, [4 Stat. 473,] vesting in the territory of Arkansas ten sections of the public unappropriated lands, for the purposes in that act specified, the governor of the territory, John Pope, selected and conveyed to the defendants, Ashley and Craig, for a price stipulated between them, the lands comprised in the several sections set forth in and

---

[1] [Reported by Samuel H. Hempstead, Esq.]
[2] [Affirmed by the supreme court in Barnard v. Ashley, 18 How. (59 U. S.) 43.]

claimed by the bill, and that in accordance with such selection, transfer, and conveyance patents, anterior in date to those held by the complainants, had been granted to the defendants for the lands in question; that the acts of the territorial governor and of the defendants were irregular and in contravention of the general and established system and policy of the government relative to the disposition of the public lands; and although the irregularities in the proceedings of the territorial governor had, by subsequent act of congress, been cured, and those proceedings ratified, so far as the rights of the government were involved, yet the intervening and vested rights of pre-emption in the complainant or his vendors could not be affected by such ratification, but remained in full force. In the answers to the original bill, Craig disclaims all title to the south-east fractional quarter of section twenty-two in township eighteen, south of range one west, but both Craig and Ashley insist upon the validity of the acts of the territorial governor, as sanctioned and confirmed by the government of the United States; they expressly deny all foundation for any right of pre-emption on the part of the complainants to any of the lands in question, aver that the representations by the complainants and their vendors, under which their claim had been urged, were false and fraudulent as respects both the government and the complainants, and insist upon their elder patent. The cross-bill of Ashley reiterates the statement in his answer to the original bill, as to the foundation of his title to the several sections, with the exception of the south-east fractional quarter of section twenty-two. To this last quarter section, he sets out a title derived from William Nooner, who had obtained a patent for it in virtue of a donation warrant under authority of an act of congress. In his cross-bill, Ashley denies all right of pre-emption in Bernard or his vendors, and prays that the junior patent to Bernard may be vacated as fraudulent and illegal. In the joint cross-bill of Craig and Ashley, the right and title of these complainants, derived from their contracts with and conveyances from the territorial governor, and from the acts of congress in relation thereto, and under the elder patent granted them, are set forth and insisted on. The bill further denies all right of pre-emption in the defendants, prays a vacation of the junior patent, and an account of the rents and profits of the land held and cultivated by Bernard, in opposition to the complainants, from the period of Bernard's adversary occupation.

It has been strenuously urged in argument, that the contract of the defendants in the original bill and complainants in the cross-bill with the territorial governor, and his selections and conveyances in execution of those contracts, were illegal, and therefore could form no just foundation for the patents

issued in pursuance thereof. This proposition could derive force only from the supposition that the alleged right of pre-emption intervening between the grant by congress to the territory and the act by the same body in ratification of the proceedings by the governor, constituted a vested interest which could not be affected by any subsequent acts of the body having the title to and possession of the subject it had undertaken to dispose of. This position involves a delicate and difficult question as to the extent of the political power over subjects within its appropriate province, which the court would reluctantly determine. But there can be no serious doubt that if such vested interest had not certainly grown up, the government would have the right and the power, as against itself, to waive any irregularity, however palpable, which should appear in the acts of its own agents. There can be no question, certainly, that the government could sanction the widest departure from the regulations it had laid down in relation to the sale of the public lands. This same power would equally apply to any supposed or real omission in the transmission or deposit of any document in any of the land-offices, especially if shown to have been the consequence of accident, misapprehension, or of delay necessarily incident to pressure of business. But is any speculation of this character rendered necessary by the evidence in this case? Is there shown by that evidence either the origin or maturity of any legal or equitable right on the part of the complainants in the original bill, defendants in the cross-bills, which has been impaired by either the contracts or by the proceedings in execution of those contracts with the governor? In other words, have they proved that they are or ever were entitled to a pre-emption to the lands in question, within the just intent and meaning of the law? And here it should be noted as a circumstance by no means unimportant in this inquiry, that the holders of the elder patent were purchasers for value under a contract open and public, and recorded both in the state and national archives, and which therefore might be regarded as notice to all the world,—a title which public policy and private security would dictate should not be displaced but in obedience to the clearest and strongest demands of justice. There is nothing obscure or equivocal, as to the commencement of this title, in the modes by which it was matured, or the agents concerned in its concoction, and it has been sanctioned by the legislative body which possessed the undoubted authority to dispose of the rights and interests of the government.

In turning to the character of the evidence on which the claim of the complainants in the original bill is founded, it is seen to consist mainly in the statements of those who had a direct interest in setting up that claim. It is mostly ex parte, and obtained from

persons manifestly ignorant and in a situation in society peculiarly liable to influence from others. But these are not the only circumstances calculated to impair the testimony adduced in support of the pre-emption. That evidence was explicitly contradicted by the statements of witnesses whose intelligence and necessary knowledge of the subjects of controversy and familiarity with the matters as to which they have deposed should give, it is thought, to their statements a decided preponderance. A detailed analysis of the evidence on the one side or the other, or any minute comment upon its separate portions, is not ·deemed necessary in this place; nor would this be practicable within the time now at the command of the court. But the examination of that evidence has led the court to these conclusions:—

1. That the claim to the pre-emption alleged in the original bill is altogether pretended and without just foundation.

2. That this claim, therefore, could interpose no valid objection to the contracts between the defendants in the original bill and the territorial governor; nor in any respect impair the authority of congress to cure any irregularities in these contracts or in their execution; even conceding that such irregularities had in fact existed.

3. That the junior patents granted to the complainant in the original bill or to his vendors, are illegal, fraudulent, and void as it respects the defendants in that bill and all persons claiming under them, and such patents should therefore be vacated.

4. That the right and title of the heirs of Chester Ashley as derived from William Nooner to the south-east fractional quarter, section twenty-two, mentioned in the bill, should be confirmed and quieted as against the complainants in the original bill, and all persons claiming under them in virtue of a pre-emption.

5. That the right, title, and estate of the complainants in the second cross-bill, and the elder patent granted them in virtue of the contracts and proceedings therein set forth, should be and are hereby established, confirmed, and quieted as against the defendants in said bill, and as against all others claiming from or under them.

6. That an account of the rents and profits of the several portions of land embraced within the patents to the defendants in the original bill or to their vendors, so far as the same now are, or since the sale and selection and conveyance by the territorial governor have been held, occupied, and cultivated by the said Bernard, or for his benefit, or for the benefit of his heirs, should be taken before and stated by a commissioner of this court, excluding however such parts of the said land as have been sold and conveyed by the said Ashley and Craig from the dates of any conveyances or alienations made by them to others.

7. That the complainants in the original bill and the defendants in the said cross-bills pay the costs incident to each of those suits. Decree accordingly.

NOTE, [from original report.] The complainants in the original bill appealed from the decree to the supreme court, where the case was argued at the December term, 1855, by Albert Pike for the appellants, and A. H. Lawrence for the appellees; and is reported in 18 How. [59 U. S.] 43. The decree was affirmed.

Mr. Justice CATRON delivered the opinion of the court.

The proceedings in the court below consisted of a bill filed by Bernard against Ashley and Craig, praying that certain patents for lands issued to the defendants might be decreed to be cancelled, upon the ground of a violation of pre-emption rights on the part of the complainant, to the following tracts, namely, north-east quarter and south-west fractional quarter of section twenty-seven; south-east fractional quarter of section twenty-eight, township eighteen south, range one west; south-west fractional quarter of section fifteen, township nineteen south, range one west; south-east quarter of section twenty-two, township eighteen south, range one west; and a cross-bill on part of Ashley to be quieted in his title to the south-east quarter of section twenty-two, against the right set up by Bernard to that tract, under a junior patent therefor, upon the ground that Bernard had no right to this tract, and that the patent was issued to him improperly. The title of Ashley and Craig (the appellees) to the first four tracts is derived from a sale to them of the land in controversy by the governor of Arkansas, in consequence of a selection made by him of the land under certain provisions of the acts of congress of 2d March, 1831, and 4th July, 1832. (4 Stat. 473, 563,) upon which selection and sale patents were issued by the United States. The title to the south-east quarter of section twenty-two, township eighteen south, range one west, is derived from the location of what is called a "lovely donation claim" on this quarter section, by virtue of the provisions of the eighth section of the acts of 24th May, 1828, (4 Stat. 306, [c. 108,]) and 6th January, 1829. (Id. 329, [c. 2, § 2.]) According to the conceded facts, it is insisted, on part of Ashley and Craig, that the register and receiver having. on due proof and examination. rejected Bernard's claims to a preference of entry of the four quarter sections, he is thereby concluded from setting them up in a court of equity, because the register and receiver acted in a judicial capacity, and their judgment. being subject to no appeal, is conclusive of the claim. And the cases of Wilcox v. Jackson, [13 Pet. (38 U. S.) 511,] and Lytle v. Arkansas, [9 How. (50 U. S.) 333,] are relied on to maintain this position.

In cases arising under the pre-emption laws of 29th May, 1830, [4 Stat. 418, c. 180,] and of 19th June, 1834, [4 Stat. 678,] the power of ascertaining and deciding on the facts which entitled a party to the right of pre-emption was vested in the register and receiver of the land district in which the land was situated, from whose decision there was no direct appeal to higher authority. But. even under these laws, the proof on which the claim was to rest was to be made "agreeably to the rules to be prescribed by the commissioner of the general land-office," and, if not so made, the entry would be suspended. when the proceeding was brought before the commissioner by an opposing claimant. In cases, however, like the one before us, where an entry had been allowed on ex parte affidavits which were impeached, and the land claimed by another, founded on an opposing entry, the course pursued at the general land-office was to return the proofs and allegations. in opposition to the entry, to the district office, with instructions to

call all the parties before the register and receiver, with a view of instituting an inquiry into the matters charged; allowing each party, on due notice, an opportunity of cross-examining the witnesses of the other, each being allowed to introduce proofs; and, on the close of the investigation, the register and receiver were instructed to report the proceeding to the general land-office, with their opinion as to the effect of the proof, and the case made by the additional testimony. And, on this return, the commissioner does in fact exercise a supervision over the acts of the register and receiver. This power of revision is exercised by virtue of the act of July 4, 1836, § 1. [5 Stat. 107, c. 352,] which provides: "That, from and after the passage of this act, the executive duties now prescribed, or which may hereafter be prescribed, by law, appertaining to the surveying and sale of the public lands of the United States, or in anywise respecting such public lands; and also such as relate to private claims of land, and the issuing of patents for all grants of land under the authority of the government of the United States, shall be subject to the supervision and control of the commissioner of the general land-office, under the direction of the president of the United States." The necessity of "supervision and control," vested in the commissioner, acting under the direction of the president, is too manifest to require comment, further than to say, that the facts found in this record show that nothing is more easily done than, apparently, to establish, by ex parte affidavits, cultivation and possession of particular quarter sections of land, when the fact is untrue. That the act of 1836 modifies the powers of registers and receivers to the extent of the commissioner's action in the instances before us, we hold to be true. But if the construction of the act of 1836, to this effect, were doubtful, the practice under it for nearly twenty years could not be disturbed without manifest impropriety. The case relied on, of Wilcox v. Jackson, 13 Pet. [38 U. S.] 511, was an ejectment suit, commenced in February, 1836; and as to the acts of the register and receiver, in allowing the entry in that case, the commissioner had no power of supervision, such as was given to him by the act of July 4, 1836, after the cause was in court. In the next case, [Lytle v. Arkansas,] (9 How. [50 U. S.] 333,) all the controverted facts on which both sides relied had transpired, and were concluded, before the act of July 4, 1836, was passed; and therefore its construction, as regards the commissioner's powers, under the act of 1836, was not involved. Whereas, in the case under consideration, the additional proceedings were had before the register and receiver in 1837, and were subject to the new powers conferred on the commissioner. In Lytle's Case, [9 How. (50 U. S.) 333,] we declared that the occupant was wrongfully deprived of his lawful right of entry under the pre-emption laws, and the title set up under the selection of the governor of Arkansas was decreed to Cloyes, the claimant,—this court holding his claim to the land to have been a legal right, by virtue of the occupancy and cultivation, subject to be defeated only by a failure to perform the conditions of making proof and tendering the purchase-money. There the facts were examined to ascertain which party had the better right, and, following out that precedent, we must do so here. Governor Pope was authorized to select lands equal to ten sections in the territory of Arkansas, in tracts not less than a quarter section each, and to sell the same for the purpose of raising a fund to erect public buildings in the territory. The three first-named quarter sections lie in township eighteen, the survey of which was made and returned to the local land-office, and approved June 4, 1834, when the lands therein were subject to entry by the governor. He made his final amended selections of the three tracts in

township eighteen, June 6, 1834. The bill claims title to these tracts under the occupant law of June 19, 1834. As Governor Pope's assignees, Craig and Ashley had a vested right when the act of June 19th was passed; it did not operate on these lands, which were appropriated to the use of the United States; and patents for them were properly awarded to the purchasers from the governor. The condition of the south-west quarter of section fifteen, township nineteen, differs from the preceding lands in this: The township survey of number nineteen was found to be inaccurate when first returned to the land-office at Little Rock, and a resurvey was ordered as to some of the section lines, which were not finally adjusted till the 19th of July, 1834. Governor Pope had selected the south-west quarter of section fifteen, on the 29th May preceding, relying on the inaccurate survey; and it is insisted for Bernard's heirs, that the selection was invalid, as it could not be made of unsurveyed lands; and that township number nineteen could not be legally recognized as surveyed, until the survey was settled and adopted by the surveyor general of the district. Our opinion is, that the selection could only take effect from the 19th of July, 1834, when the township survey was sanctioned, and became a record in the district land-office. As the occupant law passed June 19th, 1834, Bernard's assignor, Richmond, could lawfully enter the quarter section, if he had occupied the same as required by law; that is to say, if he was in possession when the act was passed, and cultivated any part of the land in the year 1833. The bill alleges that Richmond occupied the quarter section June 19, 1834; that he had cultivated the same in 1833, and made due proof of his right of pre-emption. It is further alleged, that on the 20th day of January, 1834, some five months before the occupant law was passed, Bernard purchased from Richmond the quarter section in dispute, and took his title bond for a conveyance when Richmond should obtain a patent for the land, and by force of this bond the bill prays to have the patent to Craig and Ashley adjudged to have been for Bernard's benefit, and that the land be decreed to Bernard's heirs.

The act of 1844 [1834] revived the act of 29th May, 1830, [4 Stat. 418,] "to grant pre-emption rights to settlers." That act provides, (section 3,) "that all assignments and transfers of rights of pre-emption given by this act, prior to the issuing of patents, shall be null and void." The act of January 23, 1832, [4 Stat. 496, c. 9,] allowed a transfer of the certificate of purchase; here, however, the assignment was made in January, 1834, when no law allowing of a preference of entry existed; but, as no reliance seems to have been placed in the pleadings on this ground of defence, we will not rest our decree on it. As respects Richmond's occupation according to the act of 1834, John Monholland, Edward Doughty, and Daniel Kuger, each swear, in similar language, "that Richmond, in the year 1833, cultivated part of the south-west fractional quarter, section fifteen, in township nineteen south, range one west of the principal meridian, and raised a corn crop on the same in that year, (1833,) and was in possession of the same on the 19th day of June, 1834." Kuger says, Richmond had his dwelling-house on the quarter section, and resided there on the 19th day of June, 1834. Jacob Silor, examined on part of the respondents Ashley and Craig, states, that he resided on Grand lake, quite near the quarter section in dispute, since 1830. He says: "In February, 1833, when I arrived on the aforesaid lake, there was a turnip patch on the south-west fractional quarter of fractional section fifteen, in township nineteen south of range one west, claimed by one Edward Doughty; which, I believe, he abandoned in consequence of the location of the ten-section claim on the land.

After Doughty left the aforesaid fractional quarter, William Richmond, in December, 1833, built a cabin where the turnip patch claimed by the said Edward Doughty was made, and planted some eschallots. The aforesaid William Richmond lived in the same township, on the Mississippi river, on the lands owned by Mr. Cummins or Mr. Shaw, on the 19th of June, 1834; and never did live on section fifteen, from the time I went on the lake to the present day." Benjamin Taylor deposes, that he settled with his negroes on township eighteen, in February, 1834; that in the spring of that year he examined, with care, the several tracts of land of Ashley and Craig, with a view to purchase them; and being asked what the situation of the south-west quarter of section fifteen was, when he examined it, answers, that "there was a small burn of cane, perhaps twenty yards square, uninclosed, without the appearance of ever having been cultivated, and no house was thereon." We suppose that it had been burnt up by fire in the woods, or removed during the winter of 1833–34. We hold the truth to be, that Richmond built a cabin in 1833, and in January, 1834, sold out his improvements to Bernard and removed away, and resided elsewhere in June, 1834; and, consequently, was not entitled to a preference of entry.

The next subject of controversy is the south-east quarter of section twenty-two, township eighteen. Ashley, by cross-bill, prayed to have his title quieted to this quarter section against Bernard's heirs, and the circuit court granted him the relief he asked. The half of section twenty-two was entered by Ashley, on a floating warrant, known as a Lovely claim. By the act of January 6, 1829, [4 Stat. 329, c. 2, § 1,] no one was permitted to enter the improvement of an actual settler in the territory, by virtue of such floating warrant; and it is alleged that Bernard was such an actual settler, and had an improvement on the south-east quarter of section twenty-two, township eighteen, before Ashley entered it. The cross-bill alleges that Bernard had improvements on section twenty-three, but that they did not extend to the south-east quarter of section twenty-two previous to the 4th of June, 1834, when Ashley entered the land. It was shortly before that time that Martin had corrected the eastern boundary of section twenty-two, locating it about one hundred yards further west, and which was adopted as the true line at the land-office. In suppport of the bill Benjamin Taylor deposes, as already stated, that he removed to the immediate neighborhood of the lands in dispute in February, 1834, when he examined the half section 22, with a view to purchase it from Ashley. He states that Thomas Bernard cultivated the south-west quarter of fractional section twenty-three, in 1834; but that his cultivation and improvement did not extend to the south half of section twenty-two, nor had any other person residence or cultivation thereon. Philip Booth states that Bernard showed him (Booth) an improvement on the south-east quarter of section twenty-two early in 1834; thinks it was an extension of his farm of two or three acres. It had been cleared the year before, but there was no cultivation. The witness does not recollect whether the clearing extended beyond the old line or the new one. Silas Craig, who was a competent witness for Ashley in this separate proceeding, deposes that he was with Martin, the surveyor, when the lines were run and adjusted, late in February, 1834; that the new and proper line bounding the section east is about one hundred yards west of the first line, which was rejected by the surveyor general; that when he was at the south-east corner of the section, he examined Bernard's improve-

ment, and ascertained that it did not extend west to the new line at any place. He seems to have made it his business to see if the improvement of Bernard extended to the south-east quarter in dispute. Romulus Payne was called on to prove the value of mesne profits and improvements; he says that Bernard commenced the cultivation on the south-east quarter of section twenty-two, in 1837. John Monholland, Edward Doughty, and several other witnesses, swear on behalf of the defendants to the cross-bill, in general terms, that Bernard had possession of the south-east quarter of section twenty-two, on the 19th of June, 1834, and that he had an improvement on part of it in 1833. Bernard, in proving up his pre-emption right, swore that he was cultivating the quarter section in 1833, and in possession on the 19th of June, 1834. And this affidavit is indorsed by two witnesses. Harrison and Butler, who merely say that they have heard Bernard's affidavit read, and that it is true. So, likewise, Jacob Silor indorsed Wm. Richmond's affidavit, made before a justice of the peace, and intended to secure a preference of entry for Bernard in Richmond's name, and which was declared sufficient by the register and receiver; and yet when Silor was re-examined as a witness in this cause, he conclusively proved that Richmond left the land, and resided elsewhere when the occupant law of June 19, 1834, was passed. The ex parte affidavits of Butler and Harrison, and those of Monholland and Doughty, were obviously written out for them to swear to as matter of form, but made with so little knowledge on the part of the witnesses, of the section lines, and the number of quarter sections on which they deposed improvements existed in 1833 and 1834, as to be of little value. And the same may be safely said of other witnesses whose affidavits were taken without cross-examintaion. It is most obvious that these loose affidavits obtained by the interested party have been made, as to the improvement being on the quarter section claimed, on the information of him who sought the preference of entry; the witnesses not knowing, of their own knowledge, where the true section line was, over which they swear Bernard's improvement extended in the year 1833. When the last examination was had before the register and receiver in 1837, Bernard's own witnesses, Philip Booth and John F. Harrison, swore the facts to be, that Bernard had "deadened the timber and cleared away the cane," on a part of south-east quarter of section twenty-two; that he fenced it early in 1834, and made a crop of corn on it that year, and was in possession June 19th, 1834. Booth, in a subsequent affidavit, contradicts his first statement. That there was no cultivation on the quarter section in 1833 we think is satisfactorily established; nor had Bernard any right to enter it. And such was the final opinion of the register and receiver, which the commissioner of the general land-office reversed, and ordered a patent to issue to Bernard.

The circuit court were obviously of opinion, as appears from the decree it made, that Craig and Taylor's evidence established the fact that Bernard had no part of the quarter section in possession in 1833 or 1834, and hence decreed for the complainants in the cross-bill. And, in the doubtful state of the evidence, we are not prepared to say that this court can hold otherwise, and therefore affirm the decree, and order the cause to be remanded for further proceedings, as respects the profits and improvements.